UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Chad E. Lindgren and his Guardians,
Bruce and Deborah Lindgren,

Plaintiffs,

v.

Camphill Village Minnesota, Inc.
and Andrew D. Konig,

Defendants.

Civil No. 00-2771 (RHK/RLE)
**MEMORANDUM OPINION AND ORDER**

---

Elizabeth W. Kimball, Kimball Law Office, Minneapolis, Minnesota, for Plaintiffs.

Mark A. Soleheim and Kari J. Thurlow, Larson, King, LLP, St. Paul, Minnesota, for Defendants.

---

**Introduction**

Chad Lindgren ("Lindgren") is a disabled adult male and a former resident of Camphill Village Minnesota, Inc. ("Camphill"), a seven-home community where individuals with and without disabilities live together in a family-style environment. The individuals with disabilities "work" for the community and are given tasks depending on their skills and abilities. In August 1999, Lindgren reported a physical abuse incident to his social worker. The following month, Camphill informed Plaintiffs that it could no longer care for Lindgren. In response, Plaintiffs commenced this action alleging claims under the Americans with Disabilities Act (the "ADA"), the Rehabilitation Act, and



JUN 1 3 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

various common law theories. Before the Court is Defendants' motion for partial summary judgment under Federal Rule of Civil Procedure 56(c). For the reasons set forth below, Defendants' motion will be granted in part. Plaintiffs will proceed to trial against Camphill on part of Count II, part of Count IV, Count V, Count VII, and part of Count VIII.

## Background

### I. The Parties

Plaintiff Lindgren is a 26-year old autistic male, whose guardians are his parents, plaintiffs Bruce and Deborah Lindgren. (Am. Compl. ¶ 9, Thurlow Aff. Ex. Z (Dep. of D. Lindgren at 22).) Plaintiffs are citizens of Minnesota. Defendant Camphill is a non-profit organization located near Sauk Centre, Minnesota and is licensed by the State of Minnesota as a "Class A Supervised Living Facility." (Thurlow Aff. Ex. B.) In May 1995, the Plaintiffs contracted with Camphill to provide adult foster care for Lindgren. (Pls' Mem. in Opp. of Summ. J. at 4; Am. Compl. ¶ 10.) He resided there until September 1999.[1] (Id.) During the time Lindgren was at Camphill, Defendant Andrew Konig worked there as a massage therapist. (Am. Compl. ¶ 8.)

---

[1]Lindgren actually left Camphill in August 1999; however, he was officially told that Camphill could no longer care for him in a letter dated September 27, 1999. (See Thurlow Aff. Ex F.) It appears that both parties use the September 1999 date as the date that Lindgren left Camphill.

## II. Factual Background

Camphill's mission is "to aid adult persons with mental handicaps to find a life of purpose and meaning with the help of the qualities that rural life can offer to this quest." (Thurlow Aff. Ex. B.) To accomplish this, individuals with and without disabilities live together in a rural family-style setting in seven different houses. Each house has houseparents, often married couples with children, who live with and care for the residents with disabilities, thus creating a "family." (Id. Ex. D.) In addition, as in any family, each resident is assigned tasks and responsibilities, depending on his or her individual abilities. (Id. Exs. C-D.) The daily tasks vary and can include caring for the animals, gardening, cooking, setting the table, taking out the trash, and caring for the land. (Id. Exs. B-D.) In addition, some residents work in the bakery or craft workshop. (Id.) Camphill cares for its residents by providing traditional medical care and social services along with alternative treatments, such as homeopathic and massage therapy. (Id. Ex. C.)

The cost of living for each disabled resident at Camphill is approximately $1,425.00 per month. (Id. Ex. C.) This fee is usually paid through several governmental sources, including Social Security and (for Minnesota residents) Minnesota Supplemental Aid. (Id. Exs. C-D.) Camphill also receives private donations to help maintain its programs. (Id. Ex. I at 15 (Dep. of William Briggs).)

Camphill describes the non-disabled individuals who work there as "volunteers,"

"caregivers," or "co-workers." (Id. Exs. B-D.) These co-workers receive no salaries, though they are provided with basic necessities such as housing, food, transportation, clothing, insurance and "means to satisfy in a modest way such more personal needs as buying books, making vacation trips, attending a concert, etc." (Id. Exs. D, H (Camphill's Personnel Policy).) Camphill is administered by a board of directors, members of thc Friends of Camphill (a support group for parents and other family members from the Twin Cities area), and other individuals. (Id.)

On May 15, 1995, Lindgren became a resident in Camphill's "adult foster care program," living in a house called Prairie Wind with David and Debbie Leighton, a married couple, as his houseparents. (Am. Compl. ¶ 10; Thurlow Aff. Ex. J. at 39 (Dep. of William Briggs).) Lindgren received governmental funds to pay for his cost of living at Camphill. (Id. Ex. Z at 72 (Dep. of Deborah Lindgren).) In addition, each month Deborah and Bruce Lindgren received a check from Social Security for Lindgren, and they sent part of that money, approximately $81.00 per month, to Camphill for Lindgren to use for his own personal use. (Id. at 73). He had several severe problems, including issues with "snitching" food, which made it difficult for the co-workers to care for him. (Id. at Ex. E (letter by Konig) (describing Lindgren ducking into food room and "quick as a flash" taking food and leaving a messy trail); Ex. Z (Dep. of Deborah Lindgren) at 145 (describing Lindgren's food problem as "obsessive-compulsive behavior.") Lindgren was assigned tasks at Camphill, including working in the bakery and garden, setting the table

for meals, chopping vegetables for meal preparation, and vacuuming the staircases in the houses. (Id. Ex. R. at 43-44.) During his time at Camphill, Lindgren never reported any earned income or filed any tax returns. (Id. Ex. Q.)

On August 2, 1999, after a weekly massage session with Andrew Konig, Konig found Lindgren in the pantry with a mouth full of food and in response, slapped him. (Id. Exs. X-Y.) The slapping incident and the events that occurred after it are what precipitated this lawsuit. Lindgren reported the incident to his social worker, and Deborah Lindgren removed him from Camphill. (Id. Ex. X and Ex. Z at 128 (Dep. of Deborah Lindgren).) An abuse report was filed with the Todd County authorities and eventually, Konig pled guilty to criminal abuse of a vulnerable adult. (Id. Ex. Y.) Camphill also formally disciplined Konig. (Id. Ex. O.)

In addition, a Camphill co-worker, Nancy Potter, sent a cover letter with a copy of a letter written by Konig to Camphill's "Parents, Friends, and Board Members." (Id. Ex. E.) In Ms. Potter's cover letter, she mentions "an event" and a "situation" involving Konig. (Id.) In Konig's two and one-half page letter, he describes "an 'incident' of alleged abuse against one of our special needs people," who was a "young man from another house with whom I do an hour of therapy on a weekly basis." (Id.) Konig describes the situation from his perspective and describes the man as someone who had been known to compulsively take and eat food. (Id.) In the letters from Ms. Potter and Konig, Lindgren was never mentioned by name. (Id.) Following those letters, William

Briggs, Camphill's Administrator, sent a follow-up letter to the same people. (Thurlow Aff. Ex. L.) In that letter, Briggs describes the actions Camphill had taken in response to the abuse incident, including actions against Konig.[2] (Id.) The letter from Briggs did not mention Lindgren by name. (Id.)

At the end of August 1999, the Leightons (Lindgren's houseparents) moved to Colorado. (Id. Ex. J. at 39 (Dep. of William Briggs).) The Leightons had planned to move to Colorado for over a year. In April 1999, in preparation for their move, Daniel and Lee Sidey moved into the Prairie Wind house to train to replace the Leightons as houseparents. (Id.) Sometime in August, the Sideys informed Camphill that they were having marital difficulties and could no longer live together in the same house but that they could live at Camphill in different homes. (Id.) Therefore, Daniel Sidey remained at Prairie Wind and Phil Drake, another co-worker who had lived there for over a year with Lindgren, became the houseparents at Prairie Wind. (Id. at 39, 50.) The two men, however, did not feel that they could not adequately provide care for Lindgren. (Id. at 39-40.)

On September 17, 1999, Deborah and Bruce Lindgren met with various people associated with Camphill and/or Lindgren to discuss Lindgren's placement and return to Camphill. (Id. Ex. J at 13-20.) At that meeting, they provided a list of eleven

---

[2]After sending the letter, Briggs received a citation from Todd County Social Services for violating "resident's right to privacy." (Thurlow Aff. Ex. X.)

"conditions" to be met before Lindgren could return to Camphill.[3] (Id. Ex. W.) Later, Briggs met with the co-workers to determine whether they could provide a suitable environment for Lindgren. (See Thurlow Aff. Ex. W.) At the meeting, two questions were addressed: (1) "Can we provide an appropriate placement for Chad that truly meets his needs?" and (2) "Are we willing and able to meet all, some, or none of the conditions/expectations of Chad's parents in his returning to Camphill?" (Id.) In a letter dated September 27, 1999, Briggs informed Plaintiffs that Camphill did want Chad but that currently it did not have "the staff expertise and the appropriate physical setting to help Chad reach his full potential." (Thurlow Aff. Ex. F.) Briggs offered to have Lindgren return to Camphill for a few weeks as part of a transition period for Lindgren so that he would have a chance to say goodbye to his friends and be told that he had done nothing wrong. (Id.) Lindgren never returned to Camphill.

---

[3]Deborah and Bruce Lindgren identified the following conditions to be addressed "if Chad is to return:" (1) Need a plan to handle the food issues; (2) Yearly training for the Village from Sheila Merzer-Workshop; (3) Chad be allowed to see movies, go bowling, eat food and drink just like others are allowed; (4) Must accept creativity use respite care from Meridian (both additional 10 hours and current use); (5) Have something in place for Villagers to feel comfortable to bring concerns and complaints; (6) Better communication with parents (as we said we did not know that the town trips had been taken away even after we had expressed concern); (7) Better teamwork-parent, Meridian, and Social Worker suggestions and concerns are valid part of the team; (8) Andrew apologize to Chad-including he is sorry, he shouldn't have gotten so mad, and if he ever gets angry or hits again, that Chad should tell someone-he did the right thing; (9) Guarantee that no revenge or hard feelings are to be directed at Chad-that he will be reassured that he is liked, wanted, and is an important part of the Village, like everyone else here; (10) We will be given a list and mailing labels for everyone that was sent a copy of Andrew's letter; and (11) Andrew issues. (Thurlow Aff. Ex.T, dep. Ex. 3.)

In December 2000, Plaintiffs commenced this lawsuit with an eight-count Complaint asserting violations of the ADA, Rehabilitation Act, and the Minnesota Human Rights Act (the "MHRA"). (Am. Compl. ¶¶ 14-23.) Plaintiffs also allege counts for (1) invasion of privacy; (2) negligent hiring, retention and supervision; (3) negligent misrepresentation; (4) assault and battery; (5) promissory estoppel; and (6) intentional and negligent infliction of emotional distress. (Id. ¶¶ 24-40.)

On March 21, 2002, Defendants moved for "summary judgment and dismissal of all claims asserted against [Defendants] in this matter." (Notice of Motion and Motion for Summ. J.) In their memorandum in support of their motion, however, they fail to address Count V (Negligent Misrepresentation), Count VII (Promissory Estoppel), and Count VIII (with respect to Negligent Infliction of Emotional Distress). The Court, therefore, will treat Defendants' Motion as one seeking partial summary judgment.

## Analysis

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the

nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

> If the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 595 (8th Cir. 2001) (quoting Celotex, 477 U.S. at 323 (1986)).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## I. The Motion Before the Court

In Plaintiffs' responsive memorandum, they concede that Andrew Konig was never

properly served. (Pls' Mem. in Opp. to Summ. J. at 2, n. 2.). Pursuant to Federal Rule of Civil Procedure 4(m), the Court will dismiss without prejudice all claims in the Amended Complaint against Defendant Konig.

Plaintiffs also have offered to dismiss the following state law causes of action: (1) Count VIII (Emotional Distress) as brought by Chad and Bruce Lindgren[4] and (2) Count IV (Negligent Hiring, Retention and Supervision) to the extent Plaintiffs have alleged negligent hiring. (Id. at 2, n. 4.) These claims will be dismissed with prejudice. The Court will now address the remaining claims against Defendant Camphill.[5]

## II. Plaintiffs' Claims Under the ADA

Although both parties were given additional time to submit materials to the Court for this motion, their submissions on the federal claims can be characterized, at best, as less than helpful. It appears that Plaintiffs' claims under the ADA fall into three categories: (1) a claim under 42 U.S.C. § 12182(a); (2) a claim for retaliatory discharge; and (3) a claim for invasion of privacy. Each claim will be considered in turn.

### a. Claim Under 42 U.S.C. § 12182(a)

Count II of the Amended Complaint states, in part, that "[p]ursuant to the ADA, 42 U.S.C. § 12182(a), the MHRA and the federal and state regulations promulgated pursuant

---

[4]Deborah Lindgren is still proceeding with her claim for emotional distress.

[5]Count VI (Assault and Battery) will not be addressed because that claim applies only to Defendant Konig.

to these Acts, defendant cannot discriminate against a person on the basis of a disability alone."[6] (Am. Compl. ¶ 18.) Section 12182(a), found in Title III of the ADA, provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Discrimination under Title III of the ADA can manifest itself, as Plaintiffs assert, in "a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i). In essence, Plaintiffs assert that Lindgren was discriminated against because (a) Camphill had the means to care for Lindgren before the abuse incident and (b) they should have had the means to care for him after the incident. (See generally Pls' Suppl. Mem.) They assert that Camphill should have accepted outside or respite care to help care for Lindgren. (Id. at 3-4).

Title III specifies four practices that can amount to actionable discrimination. See 42 U.S.C. § 12182(b)(2)(A). Based on Plaintiffs' assertions about outside and respite care, it appears that Plaintiffs are alleging discrimination under subsection (iii), which

---

[6]Camphill failed to address this section in its summary judgment memoranda even though it moved for summary judgment on the ADA claims, and Plaintiffs too were silent regarding this section. On May 23, 2002, the Court ordered the parties to brief the viability of a claim under § 12182(a). (See Order dated May 23, 2002.) The Court has received and reviewed the memoranda submitted both in support of and in opposition to a claim under this section.

provides:

> (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an unduc burden.

42 U.S.C. § 12182(2)(A)(iii) (emphasis added).[7]

Therefore to state a claim under Title III, Plaintiffs must demonstrate the following: (1) that Lindgren is disabled within the meaning of the ADA; (2) that Camphill is a private entity that owns, leases, or operates a place of public accommodation; (3) that Camphill took adverse action against Lindgren that was based upon his disability; and (4) that Camphill failed to take the necessary steps to ensure that Lindgren was not denied services because of the absence of auxiliary aids or services. 42 U.S.C. § 12182(a), (b)(2)(A)(iii). If Plaintiffs do so, then Camphill has the opportunity to show that taking the steps Plaintiffs ask for "would fundamentally alter the nature of the good, service,

---

[7]It is possible that Plaintiffs' claims arise under subsection § 12182(b)(2)(A)(i) or (ii), which would involve a slightly different analysis. See 42 U.S.C. §12182(b)(2)(A)(i)-(ii). It should be noted that claims under either subsection would not change the Court's opinion on a claim under § 12182 because Camphill, at this stage, has not met its burden necessary for summary judgment under subsections (i) or (ii)–i.e., it has not shown that criteria to care for Lindgren was "necessary" for its services or that making reasonable modifications for Lindgren would "fundamentally alter" the nature of services it provides. See generally, Amir, 184 F.3d at 1027 (analyzing a claim under 42 U.S.C. § 12182(b)(A)(ii)); Hahn, 130 F. Supp. 2d at 1053 (using Amir framework to analyze claims under 42 U.S.C. § 12182(b)(A)(i)-(iii)).

facility, privilege, advantage, or accommodation being offered or would result in an unfair burden." 42 U.S.C. § 12182(b)(2)(A)(iii); Roberts v. Kindercare Learning Ctrs., Inc., 896 F. Supp. 2d 921, 926 (D. Minn. 1995) (Magnuson, J.)

The parties do not dispute that Lindgren, as an autistic adult male, is disabled within the meaning of the ADA. Sec 42 U.S.C. § 12102(2). They do dispute, however, whether Camphill is a place of public accommodation. Camphill asserts that it is a residential facility because Lindgren lived there full-time and that § 12182 does not apply because "other place of lodging" does not include residential facilities. (Defs.' Suppl. Mem. at 2-3.) Plaintiffs contend that Camphill is a place of public accommodation by focusing on the services that Camphill offers, including its bakery, woodworking shop, and services for the disabled. (Pls' Suppl. Mem. at 3.)

Title III's definition of "public accommodation" lists twelve categories of establishments that are considered public accommodations "if the operations of such entities affect commerce." See 42 U.S.C. § 12181(7). Camphill focuses its argument on §12181(7)(A), which includes "an inn, hotel, motel, or other place of lodging." It fails to consider subsection K, however, which includes "a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment." 42 U.S.C. § 12181(7)(K) (emphasis added). Camphill, according to its own literature, is a community to "aid adult persons with mental handicaps." (Thurlow Aff. Ex. B.) A sister court has found that a home for an autistic adult male, which was

similar to a group home, was a public accommodation. See Hahn v. Linn County, IA, 130 F. Supp. 2d 1036, 1054 (N.D. Iowa 2001). The Court finds Hahn persuasive and concludes that Camphill is a social center establishment and thus, a private entity that operates a place of public accommodation.

After a plaintiff proves that he is disabled and that the defendant operates a place of public accommodation, the plaintiff must then demonstrate discrimination based upon his disability. Amir v. St. Louis Univ., 184 F.3d 1017, 1028 (8th Cir. 1999). Plaintiffs have presented evidence that Camphill declined to take Lindgren back because it did not have the expertise to assist Lindgren. The level of expertise needed is directly related to Lindgren's disability, not Camphill's reaction to the abuse incident.[8]

Plaintiffs point out that Camphill could have used respite care to meet Lindgren's additional needs. (Pls.' Suppl. Mem. at 3-4). In response, relying on Walton v. Mental Health Ass'n of Southeastern PA., 168 F.3d 661, 670 (3d Cir. 1999), Camphill asserts that Plaintiffs have failed to establish that Camphill could have provided a reasonable modification to meet Lindgren's needs. (Defs.' Supp. Reply Mem. at 2.) The court in Walton states, "[o]n the issue of reasonable accommodation, the plaintiff bears only the

---

[8]Camphill claims that Plaintiffs are attempting to use their arguments regarding retaliation to support their discrimination claim under §12182. (Defs.' Supp. Reply Mem. at 1, n.3 (citing to Amir, 187 F.3d at 1028).) Plaintiffs' retaliation arguments involve their allegations that Camphill retaliated against Plaintiffs by refusing to let Lindgren return to Camphill after the abuse incident was reported. Camphill's argument is without merit.

burden of identifying an accommodation, the costs of which, facially, do not clearly exceed the benefits." Walton, 168 F.3d at 671. Walton is not binding on this Court. In any event, however, the Plaintiffs have met their burden under Walton; they have identified the accommodation–additional respite care–the cost of which on its face does not appear to exceed the benefit–having Lindgren remain in a home where he was lived for over four years. Although the cost of respite care was not discussed by the parties, from the record it appears that respite care is an option available at Camphill. (See Thurlow Aff. Ex. Z (Dep. of Deborah Lindgren) at 145 (mentioning that respite care had been discussed prior to the abuse incident); Ex. J (Dep. of William Briggs) at 10 (stating that others at Camphill received respite care).) Thus, Plaintiffs have fulfilled the third and forth requirements under §12182(b)(2)(A)(iii). Accordingly, Plaintiffs have stated a prima facie case.

In response, Camphill's burden is to show that caring for Lindgren would be an "undue burden" or would "fundamentally alter" its services. See 42 U.S.C. § 12182(2)(A)(iii); Roberts; 896 F. Supp. 2d at 925; Hahn, 130 F. Supp. 2d at 1056-57. The EEOC has implemented regulations that describe "undue burden" to mean "significant difficulty and expense" and have listed five considerations to be used in determining if something is an undue burden. 28 C.F.R. § 36.104. Camphill does not address any of these and instead explains simply that it could not meet Lindgren's needs because his houseparents moved to Colorado and that it had not yet found houseparents to

care for Lindgren. (Defs.' Suppl. Mem. at 5). While it may be true that it was difficult to find and train houseparents to care for Lindgren, especially in light of the demands Lindgren's parents made (see footnote 3, supra), Camphill has come forward with no evidence about the difficulty of finding houseparents, the impact on the other operations at Camphill, the cost involved in training houseparents, or the safety requirements for other residents. See 28 C.F.R. § 36.104. Without more, genuine issues of material fact exist; accordingly, summary judgment is denied.[9]

**b. Claim for Retaliatory Discharge**

Plaintiffs have alleged a claim for retaliatory discharge under the ADA. They state that Lindgren "is a member of a protected class (vulnerable adult), he was qualified for the position with Camphill, but was discharged from that position in retaliation for reporting the assault to his social worker and insisting that it be investigated and reported to the state authorities." (Pls.' Mem. in Opp. to Summ. J. at 5-6 (footnotes omitted); see also Am. Compl. ¶¶ 12, 21.) "Mr. Lindgren therefore alleges that the defendants discriminated and retaliated against him in violation of the ADA, the MHRA, and the

[9]Although the Court has concluded that summary judgment is not appropriate on this basis, the Court notes that Plaintiffs' evidence, as presented to the Court in opposition to the instant motion, is minimally sufficient to establish a genuine issue of material fact with respect to whether Camphill denied Lindgren, on the basis of his disability, the opportunity to participate in or receive benefits from Camphill. In addition, given the eleven "conditions" and the timing of the Sideys' martial difficulties, Plaintiffs may well be unable to satisfy their burden of proof at trial. The determination herein will not preclude Camphill from making a Rule 50(a) motion during the trial, both with respect to the matters raised by this motion and other issues which may arise during the trial.

Rehabilitation Act."[10] (Pls.' Mem. in Opp. to Summ. J. at 5, n. 10; Am. Compl. ¶ 21.)

Section 12203 of the ADA prohibits retaliation and provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a) (emphasis added). A prima facie case of retaliation consists of three elements: (i) protected activity, (ii) adverse action taken by the employer against the employee, and (iii) a causal link between the two. Cossette v. Minnesota Power & Light, 188 F.3d 964, 972 (8th Cir. 1999).

In order to be engaged in "protected activity," an individual must be objecting to an action made unlawful by the ADA or charging, testifying about, or assisting or participating in an investigation with respect to an action that is prohibited by the ADA

---

[10]The Court notes that Plaintiffs have cast their ADA allegations as a mix between employment discrimination ("he is a member of a protected class") and retaliation ("Defendant has retaliated against Mr. Lindgren.") (Pls.' Mem. in Opp. to Summ. J. at 5-6; Am. Compl. ¶¶ 12, 21.) To state a prima facie case of employment discrimination under the ADA, Plaintiffs must show that (1) Lindgren is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of the position he sought, and (3) he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (internal citations omitted). To the extent that Plaintiffs are alleging employment discrimination under subchapter I of the ADA, the Court's analysis regarding "employee" in the context of the invasion of privacy claim applies. Because the Court finds that Lindgren was not an employee of Camphill, Plaintiffs do not have any claim for disability discrimination under subchapter I of the ADA. See Birchem v. Knights of Columbus, 116 F.3d 310, 312 (8th Cir. 1997) (explaining that Title I of the ADA only protects employees).

under subchapter I, II or III. See 42 U.S.C. § 12203(c). Subchapter I protects disabled employees from discrimination by employers. See 42 U.S.C. §§ 12111-12. Subchapter II prohibits the exclusion of disabled persons from participating in or receiving benefits of services, programs, or activities of public entities. See 42 U.S.C. §§ 12131-32. Subchapter III, as explained above, prohibits discrimination by places of public accommodation. See 42 U.S.C. §§ 12181-82. To show that Lindgren engaged in protected activity, Plaintiffs must show that Lindgren was objecting to or charging, testifying about, or assisting or participating in an investigation of an action that violates one of these subchapters of the ADA.

Plaintiffs allege that "Defendant has retaliated against Mr. Lindgren for complaining about the assault upon him and the reporting of the unlawful acts of the Defendant." (Am. Compl. ¶ 21.) Camphill, for its part, does not discuss the standard used to determine whether an act is a "protected activity," and instead states that it does "not dispute that Chad Lindgren's report of the August 2, 1999 incident was a statutorily protected activity." (Defs.' Mem. in Supp. of Summ. J. at 14 n.4.) The Court, however, reaches a different conclusion. Lindgren's activity was the "complaining" and "reporting" of the assault by Konig. For that activity to be protected, the assault needs to be prohibited by the ADA; it is not. See 42 U.S.C. §§ 12112, 12132, 12182. Therefore, the Court concludes that Plaintiffs have failed to establish a prima facie case of retaliation under the ADA because Lindgren did not engage in protected activity; therefore,

summary judgment on this claim is appropriate.

### c. Claim for Invasion of Privacy

Count III of the Amended Complaint, entitled "Invasion of Privacy," makes no reference to the law under which this claim arises. (Am. Compl. ¶¶ 24-28.) In their responsive memorandum, however, Plaintiffs assert that they are bringing this claim under common law, the ADA, and the Rehabilitation Act. To support their ADA invasion of privacy claim, Plaintiffs rely on § 12112(d) of the ADA, which provides that "information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record." 42 U.S.C. § 12112(d)(3)(B). Section 12112(d) is part of subchapter I of the ADA concerning employment discrimination, involves medical examinations and inquiries, and applies to job applicants and employees. See 42 U.S.C. § 12112(d).

There is no assertion by Plaintiffs, and a reasonable jury could not find on the record before the Court, that Lindgren was a job applicant. The issue before the Court, then, is whether Lindgren was an employee of Camphill for the purposes § 12112(d).[11]

The ADA defines an employee as "an individual employed by an employer." 42 U.S.C. § 12114(4). Title VII and ERISA use the same definition, and the Supreme Court

[11] In its Dismissal and Notice of Rights letter dated September 22, 2000, the EEOC closed its file because it determined that there was "no employee/employer relationship." (Thurlow Aff. Ex. V.)

has observed that the definition is "completely circular and explains nothing." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 318 (1992). Therefore, both the Supreme Court and Eighth Circuit look to the common-law agency doctrine to determine if an individual is an employee. Schwieger v. Farm Bureau Ins. Co. of Nebraska, 207 F.3d 480, 483 (8th Cir. 2000). The Eighth Circuit has summarized the test as follows:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Wilde v. County of Kandiyohi, 15 F.3d 103, 106 (8th Cir. 1994) (internal citations omitted). The Eighth Circuit also uses an economic realities test in addition to the agency test which includes: (1) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (2) whether the worker accumulates retirement benefits; (3) whether the "employer" pays social security taxes; and (4) whether the worker accrues yearly leave. Id. at 105. Factors used in both tests are non-exhaustive, and consideration of the additional economic factors does not broaden the traditional common-law test. Id. at 106. Moreover, those factors that are

equally irrelevant or of indeterminate weight should be disregarded in light of the particular facts that apply in each case. Hanson v. Friends of Minnesota Sinfonia, 181 F. Supp. 2d 1003, 1007 (D. Minn. 2002) (Rosenbaum, J.) (citations omitted).

Throughout this case, Plaintiffs have cast Lindgren as an employee of Camphill, discussing his "discharge" and Camphill's "employment procedures," requesting "back pay" and "loss of earnings," and citing sections in subchapter I of the ADA. (See generally, Am. Compl., Rule 26(f) Report; Pls.' Mem. in Opp. to Summ. J.; Thurlow Aff. Ex. CC (Defs.' Answer to Pls.' Interrogatories).) Yet, they have come forward with no legal or factual support for their assumption that Lindgren was an employee. Camphill challenges Plaintiffs' assertion that Lindgren was an employee of Camphill, although it did not address the issue in the context of the invasion of privacy claim and did not look to the law of the Eighth Circuit. (Defs.' Mem. in Supp. to Summ. J. at 12-13.)

Applying the relevant factors used by the Eighth Circuit to this case, the Court concludes that Lindgren was not an employee of Camphill. See, e.g., Hanson, 181 F. Supp. 2d at 1007 (concluding that musician was not an employee because, in part, she was in control of her schedule, she did not earn vacation, and she did not receive benefits). In reaching this conclusion, the Court notes that (1) Lindgren was a resident of Camphill and his "jobs" were part of his care, (2) governmental funds were used to pay for him to reside at Camphill; (3) he never reported receiving any income and never paid taxes on any money earned at Camphill; and (4) he received no vacation, retirement, or

other benefits from Camphill. Accordingly, summary judgment is appropriate in favor of Camphill on the invasion of privacy claim under the ADA because Lindgren, as a non-employee, cannot maintain a claim under subchapter I of the ADA.

## III. Plaintiffs' Claims Under the Rehabilitation Act

It appears that Plaintiffs' Rehabilitation Act claims fall into two categories: (1) a claim for retaliatory discharge and (2) a claim for invasion of privacy. Each claim will be considered in turn.

### a. Claim for Retaliatory Discharge

Count I of the Amended Complaint, entitled Rehabilitation Act, states:

> 14. Plaintiffs incorporate by reference as if realleged, paragraphs 1-13.
> 15. Defendants' actions violate Plaintiffs [sic] rights under the Rehabilitation Act of 1973.

(Am. Compl. ¶¶ 14-15.) Paragraph 12 of the Amended Complaint provides that Lindgren:

> is a member of a protected class, he was qualified for the position with Camphill, but was discharged from that position in retaliation for reporting the assault to his social worker and insisting that it be investigated and reported to the state authorities. Mr. Lindgren therefore alleges that the defendants discriminated and retaliated against him in violation of the ADA, MHRA, and the Rehabilitation Act.

(Am. Compl. ¶ 12.)[12] From this, the Court concludes that Plaintiffs are alleging a claim of retaliation under the Rehabilitation Act. Camphill fails to address a retaliation claim under the Rehabilitation Act, except to cite two statutory sections for the proposition that the analysis of a claim under the Rehabilitation Act is the same as under the ADA. (Defs.' Mem. in Supp. of Summ. J. at 14.) The statutory sections that it cites do not address retaliation.[13] For their part, Plaintiffs have provided the Court with little authority for their Rehabilitation Act claim. In a footnote, they cite Allison v. Department of Corrections, 94 F.3d 494, 497 (8th Cir. 1997) for the proposition that the claims under the Rehabilitation Act and the ADA should be analyzed in the same manner. (Pls.' Mem. in Opp. to Summ. J. at 6 n.12.) Allison, however, did not involve a claim of retaliation. In addition, citing § 501 of the Rehabilitation Act, Plaintiffs state, "[t]he ADA and the Rehabilitation Act also cover job training and vocational therapy when an entity is receiving federal funds for this." (Id. at 7 (also citing 42 U.S.C. § 12112(b)(2) of the

---

[12]To the extent that Plaintiffs attempt to state a claim for employment discrimination under the Rehabilitation Act, employment discrimination is governed by the standards set forth in subchapter I of the ADA See 29 U.S.C. §§ 791(g), 794(d). As discussed above, Plaintiffs cannot sustain a claim under subchapter I of the ADA because Lindgren was not an employee of Camphill. Accordingly, Lindgren cannot sustain a claim for employment discrimination under the Rehabilitation Act either.

[13]Camphill instructs the Court to compare 29 U.S.C. § 706(7) with 42 U.S.C. § 12102(2). Section 706, entitled "Allotment percentage," has no subsection (7). The subsection that Camphill is likely referring to was repealed in 1998; presumably, Camphill is instructing the Court to look at the definition of "disability," which now can be found at 29 U.S.C. § 705(9)(B) and is identical to the definition found in 42 U.S.C. § 12102(2)(A).

ADA).) Section 501 of the Rehabilitation Act, codified at 29 U.S.C. § 791, deals with the establishment of federal commissions and state agencies to implement policies and procedures to facilitate the hiring and employment of individuals with disabilities, reports to Congress, and the like. See 29 U.S.C. § 791. That section discusses vocational and job training only in the context of encouraging states to adopt policies and procedures consistent with the Rehabilitation Act. Id.

The Rehabilitation Act does not expressly include a cause of action for retaliation; however as the court in Davis v. Flexman, 109 F. Supp. 2d 776 (S.D. Ohio 1999), explained:

> The Act incorporates by reference . . . the anti-retaliation provisions of Title VI. See 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C.A. § 2000d et seq.) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."); see also 45 C.F.R. § 84.61, promulgated under the Rehabilitation Act and incorporating 45 C.F.R. § 80.7(e), a Title VI anti-retaliation provision, which states: "Intimidatory or retaliatory acts prohibited. No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder."

Davis, 109 F. Supp. 2d at 802-803, n.26. Therefore, as the foregoing language explains,

the Rehabilitation Act provides protection for an individual who makes a complaint, testifies about, or assists or participates in an investigation of an action that violates one of the subchapters of the Rehabilitation Act (i.e., engages in "protected activity). To establish a prima facie case of retaliation in violation of the Rehabilitation Act, a plaintiff must establish three elements: (i) protected activity, (ii) adverse action taken by the employer against the employee, and (iii) a causal link between the two. Bennett v. Henderson, 15 F. Supp. 2d 1097, 1112 (D. Kan. 1998). No claim has been made that Lindgren was reporting an alleged violation of the Rehabilitation Act after which he was retaliated against; instead, he was reporting an assault. (Am. Compl. ¶ 21.) As with the retaliation claim under the ADA, the assault by Konig is not actionable under the Rehabilitation Act. See 29 U.S.C. § 791.

To the extent that Plaintiffs should have or intended to bring their retaliation claim under § 504, which is found at 29 U.S.C. § 794, that claim fails as well. That section provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Again, Lindgren was reporting an assault, which is not prohibited under this section. See id. An assault allegation cannot be "bootstrapped" into a

retaliation allegation under the Rehabilitation Act. See Hoyt v. St. Mary's Rehab. Center, 711 F.2d 864, 867 (8th Cir. 1983) (explaining that the claim in substance was "a medical malpractice case, and it cannot be bootstrapped by a retaliation theory into a case under § 504."). Accordingly, the Court concludes that Plaintiffs have failed to establish a prima facie case of retaliation under the Rehabilitation Act because Lindgren did not engage in protected activity; therefore, summary judgment on this claim is appropriate.

**b. Claim for Invasion of Privacy**

Plaintiffs also assert that they are bringing a claim under the Rehabilitation Act for invasion of privacy, tacking a footnote onto their citation to 42 U.S.C. § 12112(d) of the ADA that states "[a]gain, the Rehabilitation Act follows the guidelines of the ADA." (Pls.' Mem. in Opp. to Summ. J. at 9, n.14.) In its reply memorandum, Camphill does not provide the Court with any statutory or case law citations relating to this cause of action. The Court is not inclined to do the parties' research for them.

From the discussion surrounding the ADA section in Plaintiffs' responsive brief, Plaintiffs can, at most, be alleging an invasion of privacy claim under the Rehabilitation Act in an employment setting. As discussed above, Lindgren was not an employee of Camphill and therefore, cannot maintain a cause of action under the ADA for invasion of privacy. The parties agree that claims under the Rehabilitation Act are analyzed in the same manner as those under the ADA. Therefore, because Plaintiffs cannot maintain their invasion of privacy claim under the ADA, they cannot maintain one under the

Rehabilitation Act. Summary judgment on this claim is appropriate.

## IV. Plaintiffs' Remaining Claims

The Court has federal question jurisdiction over this case pursuant to the claims asserted under the ADA and the Rehabilitation Act and supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. §§ 1331, 1367. Because the Court has determined that summary judgment is not appropriate on the claim under § 12182 of the ADA, the Court retains jurisdiction over the remaining state law claims and will now address each in turn.

### a. Minnesota Human Rights Act

In Count II, it appears that Plaintiffs are alleging a retaliation claim under the Minnesota Human Rights Act (the "MHRA").[14] (See Am. Compl. ¶¶ 20-22). The parties and the Court agree that claims under the MHRA are analyzed the same as claims under the ADA. See Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001); Breiland v. Advance Circuits, Inc., 976 F. Supp. 858, 865 (D. Minn. 1997) (Doty, J.) (utilizing same standard when retaliation claim was based on both the ADA and MHRA). Because the Court has concluded that summary judgment is appropriate on the retaliation claim under the ADA, summary judgment is appropriate on Plaintiffs' claim under the

[14] To the extent that Plaintiffs may be alleging a claim under the MHRA similar to their claim under 42 U.S.C. § 12182, the analysis for liability under both statutes is the same. See Roberts, 896 F. Supp. at 926-28; Minn. Stat. § 363.03. If Plaintiffs proceed under this theory, they should be prepared to address the available remedies (and the procedures those remedies require) under each statute.

MHRA.[15]

### b. Invasion of Privacy–Publication of Private Facts

In Count III, entitled Invasion of Privacy, Plaintiffs allege that "Defendants disseminated information about the plaintiff . . . that was confidential and without his permission" and that "Plaintiff has been damaged and embarrassed by defendants' act." (Am. Compl. ¶¶ 25, 27.) Plaintiffs based their allegations on three letters sent to Camphill's friends and family–a cover letter sent by Nancy Potter, a letter by Defendant Konig, and a letter by William Briggs. (Pls.' Mem. in Opp. to Summ. J. at 10.) None of these letters mentioned Lindgren by name. (See Thurlow Aff. Exs. E, L.) Plaintiffs contend that the letters, even without using his name, clearly referred to Lindgren and that because of this "Chad Lindgren was humiliated, embarrassed and suffered other damages." (Pls.' Mem. in Opp. to Summ. J. at 10.) Camphill responds that there is no cause of action because (1) Lindgren was never mentioned by name in the letters and (2) Plaintiffs cannot prove damages, having failed to make Lindgren available for deposition. (Defs.' Reply Mem. in Supp. of Summ. J. at 6.)

In Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231 (Minn. 1998), the Minnesota Supreme Court recognized three versions of the tort of invasion of privacy–intrusion

---

[15]To the extent that the Plaintiffs have attempted to allege a claim for employment discrimination under the MHRA, the Court's analysis regarding such a claim under the ADA applies. See Treanor v. MCI Telecomm. Corp., 300 F.3d 570, 574 (8th Cir. 2000) (analyzing an employment discrimination case under both the ADA and MHRA). Thus, Plaintiffs do not have a claim for employment discrimination under the MHRA.

upon seclusion, appropriation of name or likeness, publication of private facts. Lake, 582 N.W.2d at 236. The version of the tort applicable here is publication of private facts, which occurs when a party "gives publicity to a matter concerning the private life of another . . . if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Id. at 233 (quoting Restatement (Second) of Torts § 652D (1977)).

As Lake and the Restatement show, it is not enough for the matter publicized to be subjectively offensive. Plaintiffs must show that the letters could be "highly offensive to a reasonable person." They have not done so and instead simply assert that "Lindgren was humiliated, embarrassed and suffered other damages." Lindgren, however, has not even been deposed. (See Magistrate Judge Erickson's Order dated March 4, 2002 (denying Plaintiffs' Motion for a Protective Order after Defendants attempted to depose Lindgren).) Mere allegations of Lindgren's damages, without factual evidence, cannot support a claim.[16] Accordingly, summary judgment is appropriate. See Phillips v. Grendahl, 2000 WL 1618593 at *3 (D. Minn. 2000) (Montgomery, J.) (concluding that plaintiff had not shown that information was "highly offensive"); St. Jude Med., Inc., 250 F.3d at 595 (summary judgment is appropriate when there is a complete failure of proof).

---

[16]There are also defects with the "publication" and "legitimate concern to the public" elements of Plaintiffs' claim.

### c. Negligent Supervision and Retention

In Count IV, Plaintiffs allege claims of negligent supervision and retention. The theory of negligent supervision is defined as "an employer's duty to control his or her employee's physical conduct while on the employer's premises or while using the employer's chattels, even when the employee is acting outside the scope of employment, in order to prevent intentional or negligent employment of personal injury." Mandy v. Minnesota Mining and Mfg., 940 F. Supp. 1463, 1471 (D. Minn. 1996) (Tunheim, J) (quoting Semrad v. Edina Realty, Inc., 493 N.W.2d 528, 534 (Minn. 1992)). Negligent retention occurs when "during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." Mandy, 940 F. Supp. at 1470.

Camphill contends that Plaintiffs' negligent supervision and retention claims are barred by the exclusivity provisions of the MHRA. (Defs.' Mem. in Supp. of Summ. J. at 18.) In response, Plaintiffs state that the claims are not precluded because the assault is a separate and distinct action from Camphill's decision to retain Konig. (Pls.' Mem. in Opp. to Summ. J. at 11.) Because the Court has granted summary judgment on Plaintiffs' claim under the MHRA, the MHRA claims do not preempt the negligent supervision or retention claims. Neither party, however, argued the merits of these claims; therefore, they are not properly before the Court, and summary judgment is not appropriate.

### d. Intentional Infliction of Emotional Distress

In Count VIII, Deborah Lindgren alleges that "Defendants have intentionally or, in the alternative, negligently inflicted severe emotional distress on Plaintiffs." (Am. Compl. ¶ 40.) Mrs. Lindgren argues her life has not been the same since she had to bring Lindgren home and that this sort of distress is the sort that people would not be subjected to normally. (Pls.' Mem. in Opp. to Summ. J. at 11-12.)

"Under Minnesota law, a plaintiff must prove the following elements to make out a claim of intentional infliction of emotional distress: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe." Boone v. Federal Express Corp., 59 F.3d 84, 86-87 (8th Cir. 1995) (citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 439 (Minn. 1983)). To constitute "extreme and outrageous" conduct, a defendant's actions "must be 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" Hubbard, 330 N.W.2d at 439 (quoting Haagenson v. National Farmers Union Prop. & Cas. Co., 277 N.W.2d 648, 652 n.3 (Minn. 1979)).

When asked about how she has suffered, Mrs. Lindgren explains that her "empty nester" lifestyle has changed with Lindgren's return and caused weight gain and impacted her sex life. (Thurlow Aff. Ex. Z at 77-78 (Dep. of Deborah Lindgren).) Such a vague and conclusory description does not give rise to a genuine issue of material fact as to

whether Camphill's conduct was "so atrocious that it passes the boundaries of decency." Even assuming for the sake of argument that the treatment Mrs. Lindgren received was "extreme and outrageous," there is no evidence before the Court that the distress she allegedly suffered was "so severe that no reasonable [person] can be expected to endure it." Hubbard, 330 N.W.2d at 439. Without more, summary judgment on the intentional infliction claim is warranted.[17]

**Conclusion**

Upon all the files, records, and proceedings herein, and for the reasons stated above, **IT IS ORDERED** that

1. Defendants' Motion for Partial Summary Judgment (Doc. No. 33) is **GRANTED IN PART.**

2. The following claims are dismissed in the Amended Complaint (Doc. No. 2):

   a. All claims against Defendant Andrew Konig are **DISMISSED**

---

[17]Count VIII also alleges a claim for negligent infliction of emotional distress. (See Am. Compl. ¶ 40.) The Minnesota Court of Appeals recently explained that for this tort, a plaintiff must establish the four elements of negligence, which are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that [the] plaintiff did in fact suffer injury. Engler v. Wehmas, 633 N.W.2d 868, 872 (Minn. Ct. App. 2001) (citations omitted). In addition, she must show that she (1) was within a zone of danger of physical impact; (2) reasonably feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations. Id. Camphill failed to address this claim in its motion for summary judgment; accordingly it is not before the Court. At trial, however, it will have an opportunity to make a Rule 50(a) motion for a judgment as a matter of law on this claim.

**WITHOUT PREJUDICE**; and

b. Count I, Count II (with respect to retaliation and employment discrimination), Count III, Count VIII (with respect to intentional infliction of emotional distress) are **DISMISSED WITH PREJUDICE.**[18]

Dated: June 13, 2002

Richard H. Kyle
United States District Judge

[18]Accordingly, Plaintiffs will proceed to trial only on the following claims: (1) Count II with respect to the claim under 42 U.S.C. § 12182 and/or the equivalent section of the MHRA; (2) Count IV with respect to negligent supervision and retention; (3) Count V–negligent misrepresentation; (4) Count VII–promissory estoppel; and (5) Count VIII with respect to negligent infliction of emotional distress.